JUDGE HELLERSTEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 14 CV 7782

JUSTIN D. BIHAG, an individual,

        Plaintiff,

        -against-

A&E TELEVISION NETWORKS, LLC, a Delaware
Limited Liability Company; HYBRID FILMS, INC., a
New York Corporation; D & D TELEVISION
PRODUCTIONS, INC., a New York Corporation;
PIVOT POINT ENTERTAINMENT, LLC, a California
Limited Liability Company; DUANE CHAPMAN,
an individual; BETH ALICE BARMORE-SMITH
CHAPMAN, an individual; and DOES 1 through 10,
inclusive,

        Defendants.

Case No.

**COMPLAINT AND JURY
DEMAND**



RECEIVED
SEP 25 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Justin D. Bihag ("Justin Bihag"), by his undersigned counsel, for his Complaint

against defendants A&E Television Networks ("AETN"), Hybrid Films ("Hybrid"), D & D

Television Productions ("D&D"), Pivot Point Entertainment ("Pivot Point"), Duane Chapman

("Dog Chapman"), and Beth Alice Barmore-Smith Chapman ("Beth Chapman" or collectively

with Dog Chapman as "Chapmans"), alleges as follows:

## The Parties

1.     Plaintiff Justin Bihag is an individual and resident of the State of Colorado.

2.     Defendant AETN is a limited liability company which is organized and existing

under the laws of the State of Delaware with a principal place of business in the State of New

York. Its members are corporations (Hearst Communications, Inc., Hearst Holdings, Inc., Hearst

LT, Inc., Disney/ABC International Television, Inc., Cable LT Holdings, Inc., and NBC-A&E

1

Holdings, Inc.), each of which is organized and existing under the laws of the State of Delaware with a principal place of business in New York.

3.     Defendant Hybrid is a corporation which is organized and existing under the laws of the State of New York with a principal place of business in the State of New York.

4.     Defendant D&D is a corporation organized and existing under the laws of the State of New York with a principal place of business in the State of New York.

5.     Upon information and belief, defendant Pivot Point is a limited liability company whose members are natural persons who are citizens of the State of California.

6.     Upon information and belief, defendant Dog Chapman is an individual and resident of the State of Hawaii.

7.     Upon information and belief, defendant Beth Chapman is an individual and resident of the State of Hawaii.

8.     Plaintiff is presently unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and, therefore, sues said defendants by such fictitiously-named defendants when the same have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by their conduct.

9.     Plaintiff is informed and believes, and based thereon alleges, that each defendant at all times mentioned in this Complaint was the agent, employee, partner, joint venture, co-conspirator, and/or employer of the other defendants and was at all times herein mentioned acting within the course and scope of that agency, employment, partnership, conspiracy, ownership or joint venture. Plaintiff is further informed and believes, and thereon alleges, that

2

the acts and conduct herein alleged of each defendant was known to, authorized by and/or ratified by the other defendants.

## Jurisdiction and Venue

10.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

11.     Pivot Point is subject to personal jurisdiction in this District because it transacted business in the State of New York.

12.     Dog Chapman is subject to personal jurisdiction in this District because he transacted business in the State of New York.

13.     Beth Chapman is subject to personal jurisdiction in this District because she transacted business in the State of New York.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims in this action occurred in this District.

## Nature of Action

15.     This is an action for damages and injunctive relief arising out of Defendants' failure to compensate Justin Bihag for his substantial contributions to the production of the television series "Dog the Bounty Hunter" ("the Show") and for Defendants' misappropriation of Justin Bihag's likeness in that series. Justin Bihag appeared in, and significantly contributed to approximately 42 episodes of the Show. Despite repeated promises that he would eventually be compensated on par with the show's other members, and despite the series' 200 plus episodes

3

grossing more than $400 million, Justin Bihag has personally been paid only $28,000 for his appearances and contributions.

### General Allegations

16.     Justin Bihag and his family were longtime friends of the Chapmans from Hawaii, where they all resided.

17.     The relationship was so close between the two families that Justin Bihag always addressed Dog Chapman and Beth Chapman as "Uncle" and "Auntie," including on the Show.

18.     On or about January of 2000, Justin Bihag began working for the Chapmans in their Hawaii office.  He maintained their facilities and performed any other task requested of him.

19.     As a result of the employment, Justin Bihag decided to drop out of High School and forego obtaining his General Education Development ("GED") degree.

20.     On or about 2003, the Chapmans requested Justin Bihag to travel to California from Hawaii in order to assist with the Andrew Luster case they were working on.

21.     On or about the time when the Chapmans attended the bail hearing for the Andrew Luster matter at the Orange County Court house, Dog Chapman, in the presence of Justin Bihag, was approached by Mark Burnett, a television producer, and Robert Sharenow, senior vice president of AETN, to discuss the possibility of doing a reality television show around Dog Chapman, his bail bonds business, and his crew.

22.     Approximately a month after the above meeting took place, Dog Chapman asked Justin Bihag to "stay close" because they were in the process of negotiating and signing a contract with A&E for the Show.

4

23.     On or about the same time, Dog Chapman promised Justin Bihag a contract worth at least $25,000 with D&D, Hybrid and AETN for the first year of Justin Bihag's involvement and participation in the recording and shooting of the Show.

24.     At all relevant times discussed herein, Justin Bihag was not represented by an attorney because the Chapmans told him not to be concerned about representation because they would "take care of him."

25.     At all relevant times discussed herein, all members of the Dog Chapman crew and affiliates were negotiating and signing contracts with D&D, Hybrid and AETN, with the assistance of agents and attorneys, except for Justin Bihag.

26.     At all relevant times discussed herein, all members of the Dog Chapman crew and cast members signed release agreements for D&D, Hybrid and AETN with the assistance of agents and attorneys in consideration for the contracts.  Justin Bihag was unrepresented at all such signings and meetings because the Chapmans led him to believe they were taking care of him and instructing him to sign releases as if it was in his best interest.  At the time all cast and crew members signed contracts and releases, Justin Bihag didn't have a high school GED and followed the advice of Dog Chapman and Beth Chapman, or "Uncle" and "Auntie."

27.     Prior to shooting the Show's first season, several meetings took place with Justin Bihag and the Chapman family at their Hawaii residence, during which the Chapmans sought to persuade him to join the family for the Show.

28.     At one point, Justin Bihag met with Hybrid and their producer in New York to discuss Justin Bihag's role in the Show and during that meeting Justin Bihag was promised a contract for his participation in the Show.

29.     On or about 2004, during the shooting of the Show's first season, Justin Bihag

filmed 12 episodes, during which he assisted with administrative duties, tracked bounties as a

member of the bounty hunter crew, prepared cases for court and even carried around filming

equipment. He can be seen throughout the Show with a badge and belt of equipment.

30.     During the filming of season one, Justin Bihag frequently inquired with producers

and Dog Chapman as to the whereabouts of his contract but was never provided one.

31.     As a result of not being provided a contract at the end of season one, Justin Bihag

left the show to obtain his GED and associates degree in New York.

32.     On or about the filming of season two, Justin Bihag received a call from Dog

Chapman asking Justin Bihag to come back to the show for a bigger and better contract.

33.     On or about the filming of season two, Justin Bihag was called in for a meeting in

New York City to meet with the executives of AETN and to discuss his future with the Show.

The executives of AETN insisted that in order for Justin Bihag to succeed on the Show they

needed his complete dedication.

34.     After said meeting, Dog Chapman again contacted Justin Bihag to persuade him

to return to the Show by promising a contract similar to the ones that the other cast members

have been offered and signed.

35.     Confident in the Chapmans good intentions for him, Justin Bihag decided to join

the Show again for the filming of season three.

36.     Upon Justin Bihag's decision to return for filming of season three, the Chapmans

purchased tickets for Justin Bihag to fly back to Hawaii for the Show.

37.     In consideration for the promised contract from the Show's executives and Dog

Chapman, Justin Bihag again signed a release without the assistance of legal representation.

6

38.     When Justin Bihag arrived at the airport in Hawaii, he was greeted with balloons, camera crews and a group of fans. Justin Bihag was not informed beforehand that he would be welcomed with a television crew.

39.     Justin Bihag stayed at the Chapman's home while season three was filmed. The day he arrived in the Chapmans' home, The Chapmans promised Justin Bihag a contract and informed him the contract was "in the works."

40.     During the filming of season three, Dog Chapman continued to promise Justin Bihag a contract and also promised Justin Bihag a meeting with the Show's producer, David Houts, and the Chapman's talent agent, Alan Nevins. However, no contract was provided to Justin Bihag and no meeting was held.

41.     During the filming of season three, Justin Bihag filmed four episodes, in addition to starring in an episode entitled "Bustin' with Justin."

42.     On or about the end of filming season three, Justin Bihag found out he would be a father.

43.     Season three of the Show returned its highest ratings to date and Dog Chapman signed a large contract to continue the Show.

44.     Justin Bihag, as a popular character, undoubtedly contributed to those favorable ratings, but he still remained the only cast member without a contract.

45.     Justin Bihag's reliance on the Defendants' promises of a contract and payment for his services caused financial hardship for himself and his family. He was unable to provide for his family and thus turned to drugs and alcohol to fight depression.

46.     On or about March 3, 2007, Justin Bihag was involved in a car accident in which he sustained significant bodily injuries.

47.   Once the Chapmans were informed of the accident, they proceeded to do interviews with the media to use the accident as a promotional tool for the Show, a promotion that would again benefit all the contracted cast members, producers, executives and networks, but not Justin Bihag.

48.   On or about Thanksgiving Day 2007, Justin Bihag had his right leg amputated below the knee as a result of his car accident.

49.   Justin Bihag sank deeper into a depression and became addicted to pain killers.

50.   During this period Justin Bihag was working for U.S. Bank as a teller and bank representative.

51.   On or about 2009, Dog Chapman contacted Justin Bihag to again request for him to return to the Show as a cast member.

52.   At this time Dog Chapman, the Show executives and producers were trying to raise the Show's ratings. The concern for ratings was a result of a recording of Dog Chapman speaking to his daughter using racial slurs, which were obtained and made public. The Show was halted for a period of time and when resumed it didn't receive the same ratings.

53.   After the conversation with Dog Chapman, Justin Bihag decided to once again, trust "Uncle" and "Auntie" and come back to the Show with the promise of a contract. The Chapmans, again, purchased Justin Bihag's airline ticket and flew him back to their Hawaii house to participate in the Show. The Chapmans renewed their promises to Justin Bihag to secure a contract, this time worth several millions of dollars to make up for the contracts they failed to provide from previous years.

54.   In anticipation of being offered a contract for the Show, Justin Bihag signed another release for all the producers and networks without any legal representation.

8

55.     During the taping of season seven Justin Bihag obtained his bail bondsman license.

56.     Throughout season seven, the Chapmans, D&D, Hybrid, Pivot and AETN, all sought to capitalize on the misfortunes of Justin Bihag by featuring him in an episode called "One for the Road" where he would reveal his prosthetic to the audience.

57.     During season seven, Justin Bihag filmed 18 episodes of the Show.  These episodes would also be used in season six.  One of the episodes recorded was titled "Justin's Come Back" but it was never aired.

58.     During this period Justin Bihag had another child for which he had to pay child support.

59.     At the end of filming season seven, Justin Bihag again requested Dog Chapman provide him with a contract.

60.     At that time, Dog Chapman gave Justin Bihag $11,000 to catch up on past due child support and to provide him with some money while Justin Bihag waited for a contract. That contract never came.

61.     Eventually, Justin Bihag lost visitation rights of his child because he was unable to maintain his child support payments as a result of not being paid for his participation on the Show.

62.     Justin Bihag recorded a total of 42 episodes of the Show.  Many of these episodes were featured in the "Best of" titles sold on DVD and online.  Justin Bihag was never properly compensated for any of this work.

### First Claim For Relief
### Misappropriation of Right of Publicity

63.     Justin Bihag incorporates Paragraphs 1 through 62 of his Complaint as if fully set forth herein.

64.     Justin Bihag appeared as an actor and major character in the Show, during which he had significant speaking roles, plot development roles, and production involvement roles.

65.     Defendants used Justin Bihag's likeness and voice in these episodes for their own commercial benefit.

66.     Justin Bihag possesses a right of publicity to control the commercial use of his image, voice and likeness, which property interest has commercial value.

67.     Defendants used Justin Bihag's image, voice and likeness without compensating Justin Bihag or otherwise obtaining permission for this use.

68.     Defendants' failure to compensate Justin Bihag for the use of his image, voice, and likeness caused Justin Bihag to suffer damages in the amount of the commercial value of the use of his image, voice and likeness on the Show.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

### Second Claim For Relief
### Breach of Contract

69.     Justin Bihag incorporates Paragraphs 1 through 68 of his Complaint as if fully set forth herein.

70.     Defendants, individually and by and through their agents, entered into a contract with Justin Bihag where in Justin Bihag would be a permanent member and partner of the Show and receive compensation in exchange for his ongoing support and participation in the Show.

71.     Defendants failed to compensate Justin Bihag for his participation in the series according to this contract.

72.     Justin Bihag performed his obligations under this contract by continuing to support and participate in the production and filming of the Show.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

### Third Claim For Relief
### Promissory Estoppel

73.     Justin Bihag incorporates Paragraphs 1 through 72 of his Complaint as if fully set forth herein.

74.     Defendants made promises to Justin Bihag regarding payment, compensation, and financial interest in the Show.

75.     Defendants should have reasonably expected that their promises would induce Justin Bihag to continue to participate and support the production of the Show in exchange for such promises.

76.     Justin Bihag, to his detriment, reasonably relied on these promises by continuing to participate in the filming and production of the Show without actual payment or a formal written contract for his payment, and by focusing his efforts on supporting the Show rather than focusing on his family, education and alternative employment.

77.     Defendants' promises to Justin Bihag must be enforced to prevent injustice.

78.     Justin Bihag suffered damages as a direct result of Defendant's failure to perform on their promises, in an amount to be proven at trial.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

## Fourth Claim For Relief
## Unjust Enrichment

79.      Justin Bihag incorporates Paragraphs 1 through 78 of his Complaint as if fully set forth herein.

80.      Justin Bihag, through his preparation, research, and support to the filming of the Show, as well as his appearance as an actor in the Show, conferred a substantial benefit on Defendants.

81.      Justin Bihag conferred these benefits without a specific agreement as to payment, but with the reasonable expectation that he would be paid by Defendants in a manner and amount as promised.

82.      Defendants, as owners and agents of the Show, realized the benefits of Justin Bihag's contribution through the successful production of approximately 42 episodes and the subsequent commercial success of such episodes and all others before and after such episodes.

83.      Defendants requested and accepted these benefits under such circumstances that they reasonably knew or should have known that Justin Bihag expected to be paid as a member and partner of the Show, and that it would be inequitable for Defendants to retain these benefits without payment to Justin Bihag of their value.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

## Fourth Claim For Relief
## Breach of the Implied Covenant of Good Faith and Fair Dealing Against All Defendants

84.      Justin Bihag incorporates Paragraphs 1 through 83 of his Complaint as if fully set forth herein.

85.     Inherent in every contract is an implied condition and the covenant that the parties will act in good faith and that no party will engage in conduct that is designed to and/or has the natural effect of depriving any other party of the benefits for which the parties bargained under the contract. Such implied covenant existed in the contract between Justin Bihag and Defendants.

86.     Defendants breached the implied covenant of good faith and fair dealing by, among other things, repeatedly reaping the financial benefit of Justin Bihag's participation in the Show without compensating him.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

### Fifth Claim For Relief
### Negligent Misrepresentation

87.     Justin Bihag incorporates Paragraphs 1 through 86 of his Complaint as if fully set forth herein.

88.     Defendants, their agents and employees, negligently and recklessly made false and misleading representations and omissions alleged herein, including but not limited to those set forth herein, intending that Justin Bihag reasonably rely upon the false and misleading representations and omissions to his detriment, which he did.

89.     As a direct and proximate result of the fraudulent statements, representations and omissions, Justin Bihag was induced to continuously return to the Show without a contract or pay.

90.     Defendants, their agents and employees, owed a duty of care to Justin Bihag.

91.     Defendants, their agents and employees, recklessly and negligently breached the duty of care they owed to Justin Bihag by making false representations to him.

92.     Defendants, their agents and employees, knew, or had reason to know, that Justin Bihag would reasonably rely on the false representations, as erroneous, would cause loss, injury or damage.

93.     Justin Bihag justifiably and reasonably took action to his detriment as alleged herein, in reliance on the false representations.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

## Sixth Claim For Relief
## Fraud

94.     Justin Bihag incorporates Paragraphs 1 through 93 of his Complaint as if fully set forth herein.

95.     Defendants, their agents and employees, negligently and recklessly made false and misleading representations and omissions alleged herein, including but not limited to those set forth herein, intending that Justin Bihag reasonably rely upon the false and misleading representations and omissions to his detriment, which he did.

96.     As a direct and proximate result of the fraudulent statements, representations and omissions, Justin Bihag was induced to continuously return to the Show without a contract or pay.

WHEREFORE, Plaintiff Justin Bihag seeks relief as set forth at the end of this Complaint.

## Jury Demand

Plaintiff Justin Bihag demands a trial by jury upon all issues so triable.

14

## **Prayer For Relief**

WHEREFORE, Plaintiff Justin Bihag demands judgment in his favor and against

Defendants as follows:

1. Damages and restitution in an amount to be proven at trial;

2. Injunctive relief;

3. Punitive damages;

4. Reasonable attorneys' fees and costs;

5. Pre and post-judgment interest at the highest allowable legal rates; and

6. Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       September 25, 2014

                         LITVIN LAW FIRM, P.C.


                         s/  Gennady Litvin_____
                         Gennady Litvin
                         Attorney Registration# 4727228
                         *Attorneys for Plaintiff*
                         1716 Coney Island Ave., Suite 5R
                         Brooklyn, NY 11230
                         (877) 829-4104 x8040
                         glitvin@litvinlaw.com